1999 ND 179

Herbert ELTER, Claimant
and Appellant,

v.

NORTH DAKOTA WORKERS
COMPENSATION BUREAU,
Appellee,

and

North Dakota Highway Patrol,
Respondent.

Nos. 990007, 990012.

Supreme Court of North Dakota.

Sept. 2, 1999.

Dean J. Haas (argued), Dietz, Little & Haas, Bismarck, N.D., for claimant and appellant.

Joseph F. Larson II, Larson Law Firm, Jamestown, N.D., for claimant and appellant.

Lawrence A. Dopson, Special Assistant Attorney General, Bismarck, N.D., for appellee.

MARING, Justice.

[¶ 1] Irene Elter ("Elter") appeals from judgments of the district court affirming the Bureau's denial of survival benefits for her husband's lung cancer she claims was presumptively caused by his work as a highway patrolman, and denying her motion for attorney fees and costs associated with a preliminary appeal in which she prevailed. We affirm the judgment affirming the Bureau's denial of Elter's claim for survivor benefits, but we reverse the judgment denying Elter's motion for attorney fees, and remand to the district court for determination of that amount.

I

[¶ 2] Herbert Elter was employed with the North Dakota Highway Patrol from 1959 until his retirement in 1989. Herbert smoked a pack to a pack and a half of cigarettes a day for a period of approximately 30 years. He was diagnosed with lung cancer in 1992 and died from ensuing complications on June 29, 1994. At the time he was diagnosed with lung cancer, Herbert had not smoked for approximately 15 years. On March 1, 1995, Herbert Elter's widow, Irene Elter, filed a survivor's

claim with the Bureau, claiming Herbert Elter's lung cancer was caused by exposure to the radar gun in his patrol car.

[¶ 3] In correspondence to the Bureau dated May 2, 1995, Dr. Pedro Mendoza, a pulmonologist and one of Herbert Elter's treating physicians, opined that the medical literature did not support the contention exposure to a radar gun causes lung cancer. Mendoza further observed "most of the etiology in his lung carcinoma" was caused by Herbert Elter's 30–year history of cigarette use. The Bureau dismissed the claim by Order dated May 22, 1995. Elter requested a formal hearing.

[¶ 4] Prior to the hearing, Elter advanced two new theories as to the cause of her husband's lung cancer. She claimed the cancer may have been caused by his exposure to asbestos and radon during his employment as a highway patrol officer. Elter supported her radon exposure claim by submitting two affidavits which stated the Ward County Courthouse was tested for radon in 1995 and a varying but low level of radon was found in three areas of the basement; and Herbert Elter frequently worked in the courthouse between 1963 and 1966. Elter supported her asbestos exposure claim with an affidavit which stated the Renville County Courthouse contained certain amounts of asbestos in 1996. Elter testified because Renville County was within his unit, Herbert Elter would have visited the courthouse frequently between 1959 and 1963.

[¶ 5] Dr. Brindle, a radiation oncologist and one of Herbert Elter's treating physicians, testified at the formal hearing held on May 6, 1996. Dr. Brindle testified that after a 15–year lapse in smoking, the risk of a former smoker developing lung cancer is "very close to no additional risk versus the non-smoking population." Brindle figured the risk of lung cancer would be only twice that of the nonsmoking population after a 15–year cessation. He opined "a two-fold increase of risk over that of lifelong non-smokers is not sufficient to state that Mr. Elter's past smoking caused his lung carcinoma." Brindle acknowledged, however, his conclusions were based on studies provided to him by Elter. Upon questioning by the Bureau regarding studies showing a much greater incidence of lung cancer among ex-smokers, Brindle acknowledged the medical studies vary as to an ex-smoker's risk of cancer after extended cessation periods; the risk ranging from two to eight times that of a lifelong nonsmoker, and ultimately concluded an ex-smoker's risk of lung cancer remains elevated over that of a lifelong nonsmoker. Brindle concluded it was more probable that Mr. Elter's lung cancer was caused by smoking than by his occupation.

[¶ 6] After the hearing, the administrative law judge ("ALJ") left the record open for the purpose of obtaining the depositions of Dr. Schenker, the Bureau's expert, and Dr. Mendoza.

[¶ 7] Dr. Mendoza agreed periods of smoking cessation lower the risk of developing lung cancer; however, Mendoza testified the risk of lung cancer among former smokers nevertheless remained elevated above nonsmokers even after long periods of abstinence. Dr. Mendoza testified there is "no documented literature that says even a hint that radar waves would cause lung cancer." He similarly ruled out asbestos exposure as a cause of Herbert Elter's lung cancer, testifying "on Herbert's [lung] tissue ... there was no indication of asbestos fibers in the lung ... he most probably did not have asbestosis." With regard to possible exposure to radon, Mendoza testified that because there is no safe level of radon exposure, any such exposure coupled with smoking could be a co-factor in the development of lung cancer. Mendoza further opined, however, even assuming Herbert Elter was exposed to radon at the levels he alleges, cigarette smoking was still the most probable cause of his lung cancer.

[¶ 8] Dr. Schenker, the Bureau's expert, testified that about 90 percent of all lung cancer is attributable to cigarette smoking,

while radon and asbestos exposure account for only a few percent. Schenker opined Herbert Elter's lung cancer was caused by his smoking even though he had quit some 15 years earlier. As to the radon argument, Schenker opined that such exposure would require a lifetime duration to be significant, and that the radon concentration he may have been exposed to was not at levels considered clinically significant. Schenker also agreed with Dr. Mendoza that the absence of asbestos fibers in Herbert Elter's lungs belied the claim his cancer was caused by asbestos exposure.

[¶ 9] On February 6, 1997, the ALJ recommended the Bureau's order be affirmed, concluding the Bureau rebutted the presumption under N.D.C.C. § 65–01–02(18)(d), and, once rebutted, Elter failed to establish the validity of her claim. The Bureau adopted the recommendation.

[¶ 10] Elter appealed to the district court, arguing she was denied a fair hearing because she was not allowed to recall Herbert Elter's treating physician to rebut Dr. Schenker's testimony. The district court vacated the Bureau's order and remanded the matter "so as to allow the testimony of Dr. Brindle as a rebuttal witness." Dr. Brindle's second deposition was taken March 30, 1998.

[¶ 11] The second deposition of Dr. Brindle focused primarily on Herbert Elter's exposure to radon in the early 1960's. Brindle testified the medical literature shows that while either smoking or radon exposure can independently increase the risk of cancer, exposure to both greatly enhances that risk. Brindle characterized the combination of radon exposure and smoking as having a "multiplicative" or "synergistic" effect, thereby increasing one's risk of developing lung cancer. When asked whether Herbert Elter's exposure to radon was a significant contributing cause to his lung cancer, however, Brindle testified "that question implies that I have some handle on his total radon exposure and smoking history, and I don't have that information ... so I don't really

have the ability to say one way or the other on that."

[¶ 12] On July 1, 1998, the ALJ affirmed again the Bureau's order denying Elter's survivor claim, concluding:

> In this case, the Bureau introduced evidence of non work related causation. The claimant's medical records and the testimony of his own treating physicians demonstrate claimant's long history of cigarette smoking and establish that claimant's lung cancer was significantly more likely to be caused by smoking than by any other factor. Further, the evidence shows that claimant's employment (and alleged exposure to radon, radar, and asbestos) was not a significant contributing factor to his lung cancer. Thus, the Bureau has overcome the presumption that Mr. Elter's lung cancer was work related.

The Bureau adopted the ALJ's recommendation. Elter appealed to the district court. The district court affirmed and Elter's timely appeal to this Court followed.

[¶ 13] Elter has another appeal before the Court. After her initial appeal to the district court, Elter submitted to the Bureau an itemized billing for $16,803.43. This amount reflected attorney's fees and costs incurred since the claim was filed. Elter demanded payment of the entire bill pursuant to N.D.C.C. § 65–10–03 (1993), contending the district court's initial order vacating the Bureau's order and remanding to allow rebuttal testimony constituted a "remand" under that statute. The Bureau refused, prompting Elter to file a motion with the district court seeking payment of the entire $16,803.43 bill, plus $402 for fees incurred in making the motion. In its response to the motion, the Bureau agreed to pay all fees and costs incurred for the initial appeal to the district court, approximately $2,000, but refused to do so until Elter had certified the precise amount of those fees. The district court nevertheless denied Elter's motion, reasoning the request for attorney fees was

premature because the remand was not based, and Elter had not prevailed, on any issue relating to the merits of her claim. Elter appealed. The appeals have been consolidated.

## II

■■■ [¶ 14] Our review of a Bureau decision denying benefits is governed by N.D.C.C. § 28–32–19. *Burrows v. North Dakota Workers' Comp. Bureau,* 510 N.W.2d 617, 618 (N.D.1994). We review the record and decision of the Bureau rather than the district court's decision. *Sunderland v. North Dakota Workmen's Comp. Bureau,* 370 N.W.2d 549, 552 (N.D. 1985). "We affirm the Bureau decision if a preponderance of the evidence supports the Bureau's findings of fact, its findings of fact support its conclusions of law, its conclusions of law support its decision, and its decision is in accordance with the law." *McDaniel v. North Dakota Workers Comp. Bureau,* 1997 ND 154, ¶ 11, 567 N.W.2d 833 (citing *Spangler v. North Dakota Workers Comp. Bureau,* 519 N.W.2d 576, 577 (N.D.1994)). The Bureau's findings are supported by a preponderance of the evidence if a reasoning mind reasonably could have determined the factual conclusions reached were proved by the weight of the evidence from the entire record. *Hoffman v. North Dakota Workers Comp. Bureau,* 1999 ND 66, ¶ 7, 592 N.W.2d 533.

■■■ [¶ 15] A claimant seeking workers compensation benefits generally has the burden of proving by a preponderance of the evidence he has a compensable injury. *See* N.D.C.C. § 65–01–11; *e.g., Flermoen v. North Dakota Workers Comp. Bureau,* 470 N.W.2d 220, 221 (N.D.1991). A compensable injury includes any injury or disease which is "fairly traceable to the [claimant's] employment." *See* N.D.C.C. § 65–01–02(18)(c).[1] A claimant need not prove her employment is the sole cause of the injury; rather, it is sufficient to prove a work condition or exposure is a "substantial contributing factor" to the injury. *McDaniel,* 1997 ND 154, ¶ 12, 567 N.W.2d 833.

■■■ [¶ 16] In claims involving full-time law enforcement officers, however, N.D.C.C. § 65–01–02(18)(d) shifts the burden of proof from the claimant to the Bureau by creating a presumption that any health impairment caused by lung or respiratory disease is fairly traceable to a work condition.[2] Under North Dakota evidentiary law this presumption shifts to the Bureau both the burden of going forward with evidence and the burden of persuasion. *See Sunderland,* 370 N.W.2d at 552 (under the North Dakota view of presumptions the party against whom it is directed "bears the burden of proving the nonexistence of the presumed fact is more probable than its existence"). The presumed fact is that the injury or disease is work-related. *Id.* To establish the injury or disease was not work-related, the Bureau "must prove that, more likely, [the work]

---

1. In 1997, the Legislature repealed § 65–01–02(18), eliminating the definitions of "fairly traceable to the employment" contained in § 65–01–02(18)(a)–(c), and re-enacting the presumption in favor of full-time firefighters and law enforcement personnel in N.D.C.C. § 65–01–15.1 (1997). *See* 1997 N.D. Sess. Laws ch. 527, § 1.

2. The statute applicable to Elter, N.D.C.C. § 65–01–02(18)(d) (1993) provided in part: [A]ny condition or impairment of health of a full-time paid firefighter or law enforcement officer caused by lung or respiratory disease, hypertension, heart disease, or exposure to infectious disease ..., or occupa-

tional cancer in a full-time paid firefighter, resulting in total or partial disability or death is presumed to have been suffered in the line of duty. The condition or impairment of health may not be attributed to any disease existing before that total or partial disability or death unless the contrary is shown by competent evidence. As used in this subdivision, an occupational cancer is one which arises out of employment as a full-time paid firefighter and is due to injury due to exposure to smoke, fumes, or carcinogenic, poisonous, toxic, or chemical substances while in the performance of active duty as a full-time paid firefighter....

was not a significant contributing factor to the injury or disease." *McDaniel,* 1997 ND 154, ¶ 14, 567 N.W.2d 833.

[¶ 17] Elter argues "[a]lthough [she] cannot prove that radon caused her husband's particular cancer, neither can the Bureau prove that smoking did." Elter misinterprets the Bureau's burden. The Bureau is not required to prove smoking caused Herbert Elter's lung cancer; rather, in this case the Bureau is required to prove that, more likely, Herbert Elter's work-place conditions while a law enforcement officer were not a significant contributing factor to his lung cancer. *McDaniel,* 1997 ND 154, ¶ 14, 567 N.W.2d 833.

■ [¶ 18] Elter relies primarily on two arguments to support her position the Bureau failed to rebut the presumption under N.D.C.C. § 65–01–02(18)(d): (1) that extended periods of smoking cessation lower the risk of lung cancer for ex-smokers to levels near that of lifelong nonsmokers, and (2) that low levels of radon exposure coupled with smoking create an increased relative risk for developing lung cancer.[3] She argues our decision in *Burrows,* 510 N.W.2d at 617 supports her argument. In *Burrows,* the treating physician and another expert unequivocally opined the claimant's smoking habit, which continued to the date of his diagnosis, was the cause of his lung cancer. *Id.* at 619. The treating physician testified the claimant was 50 times more likely than a nonsmoker to develop lung cancer. *Id.* Elter attempts to distinguish *Burrows,* pointing out, unlike her husband's situation, there was no carcinogen exposure in Burrow's work-place increasing the relative risk in developing lung cancer. Elter further argues her husband was not 50 times more likely to develop lung cancer than a nonsmoker; rather, because of her husband's 15–year period of not smoking his risk was near

that of a lifelong nonsmoker. We are not persuaded.

[¶ 19] The evidence about Herbert Elter's exposure to radon is that a courthouse he had occasion to visit for a period of three years nearly forty years ago contained moderate to low levels of radon in 1995. The ALJ concluded there was no credible evidence establishing the levels of radon in the courthouse between 1963 and 1966, nor was there any evidence establishing how frequently Herbert Elter worked at the courthouse or the level of radon in any of the areas of the courthouse in which he may have worked.

[¶ 20] While Dr. Brindle testified even small amounts of radon exposure have a "multiplicative effect" when coupled with smoking, he could not assess the relative increased risk to Herbert Elter because he did not "know if [Herbert Elter] was ever exposed to any radon in [the] courthouse." Consequently, when asked whether Herbert Elter's exposure was a significant contributing cause of his lung cancer he replied he could not say. Dr. Mendoza testified radon is carcinogenic only with repeated exposure. Asked whether Herbert Elter's radon exposure increased his relative risk of lung cancer, Dr. Mendoza testified "[i]f he was exposed, then you have to consider it a co-factor . . . to what extent . . . I couldn't give you a quantification because I don't have the numbers to back that up."

[¶ 21] Even if Herbert Elter was exposed to some level of radon in the early 1960's, there is no evidence that his work exposure was a substantial contributing factor of his lung cancer. None of the testifying experts could even definitively determine whether Herbert Elter's carcinogen exposure in the work place increased the relative risk in developing lung cancer.

[¶ 22] After careful review of the experts' testimony and the medical literature

---

**3.** On appeal, Elter focuses solely on Herbert Elter's exposure to radon in the workplace to support her argument the Bureau failed to rebut the presumption under N.D.C.C. § 65– 01–02(18) (1995). Because she did not address the findings with respect to Herbert Elter's exposure to asbestos and his radar gun, we will not address them either.

on which the experts relied, we conclude a reasoning mind could have reasonably determined the conclusion that the Bureau rebutted the presumption under N.D.C.C. § 65–01–02(18) (1995) was supported by a preponderance of the evidence.

### III

[¶ 23] Elter contends her right to a fair hearing was violated because she was not allowed preliminary discovery with respect to the deposition testimony of the Bureau's expert, Dr. Schenker. Elter argues she was denied the right to effective cross-examination of Schenker because of the Bureau's failure to provide a written report detailing the basis of his opinion.

[¶ 24] On March 15, 1996, the hearing officer granted the Bureau's motion for a continuance to allow the parties to depose each others' expert witnesses, which was to be completed within 30 days. On April 3, 1996, the hearing officer ordered the Bureau to disclose its expert witness. In a letter dated April 15, 1996, the Bureau disclosed its witness, provided his curriculum vitae, and stated the witness would "testify as to the probability that Mr. Elter's death was caused by smoking as opposed to any occupational exposures." On April 22, 1996, in response to a Bureau interrogatory question asking whether Elter planned to cross-examine the Bureau's expert, Elter answered "if any expert will submit a report, or testify by deposition to be used at hearing, Ms. Elter demands prior opportunity to cross-examine by discovery deposition." One week before the formal hearing, Elter had not yet received a report summarizing Dr. Schenker's opinion. Thus, on April 29, 1996, Elter requested the hearing officer exclude Dr. Schenker's testimony, or alternatively grant a continuance to allow her to depose Dr. Brindle again for rebuttal testimony. The hearing officer denied both requests. Elter argues the Bureau's decision should be reversed because "[t]he rules of the agency have not afforded the appellant a fair hearing." N.D.C.C. § 28–32–19(4).

[¶ 25] Administrative agency hearings are conducted in accordance with the administrative hearings provisions of Chapter 28–32. *Blanchard v. North Dakota Workers Comp. Bureau*, 1997 ND 118, ¶ 13, 565 N.W.2d 485. Section 28–32–05(2), N.D.C.C., describes procedural rules for all administrative agencies and "[a]t any contested case hearing" affords an applicant the opportunity to present evidence and cross-examine witnesses as permitted under N.D.C.C. §§ 28–32–06 and 28–32–11.1.

[¶ 26] We find no statute in either the Administrative Agencies Procedure Act or the Workers Compensation statutes establishing an affirmative obligation on the part of the Bureau to provide a claimant with a written report detailing the basis of its expert's opinion. Although Elter requested an opportunity to depose Schenker prior to the formal hearing, she made no specific request for a report detailing Schenker's opinion prior to the scheduled deposition on May 6, 1996. While the hearing officer denied Elter's request for a continuance to allow rebuttal testimony of Dr. Brindle, the district court later vacated the Bureau's order and remanded the matter to obtain rebuttal testimony to Dr. Schenker's testimony. Dr. Brindle was deposed again in March 1998. While the Bureau's late disclosure of its expert witness and failure to provide a report does not comport with its limited adversarial role in a worker's compensation claim, *Frohlich v. North Dakota Workers Comp. Bureau*, 556 N.W.2d 297, 301 (N.D.1996), we are persuaded the district court's remand to develop rebuttal testimony cured any prejudice caused by the Bureau's actions.

[¶ 27] Elter argues she was also denied a fair hearing because the hearing officer failed to recuse herself from the case. Under N.D.C.C. § 28–32–08.1(3) "[a]ny party may petition for the disqualification of any person presiding as a hearing officer upon discovering facts establishing grounds for disqualification." Disqualifica-

tion is warranted when "good cause" is shown. N.D.C.C. § 28–32–08.1(2). Good cause was established, Elter argues, by the fact that at the time of the hearing the hearing officer performed investigative services for an insurance adjustment company which the Bureau regularly employed in its fraud cases. In a letter to the Director of the Office of Administrative Appeals, Elter's counsel wrote, "[a]lthough I do not allege that Ms. Seaworth is incapable of acting fairly in this matter, the appearance of an impropriety is sufficient grounds for disqualification."

[¶ 28] The Director of the Office of Administrative Appeals found the hearing officer did provide investigative services on a limited basis to the Bureau, however, she was under contract with the insurance adjusting company, not with the Bureau. The Director also found the hearing officer had not worked on this particular case in an investigative capacity, had no personal knowledge of the disputed facts, and had no economic or other interest in the outcome of the case. Finding no reason to question the impartiality of the hearing officer, the Director refused to designate a new one under N.D.C.C. § 28–32–08.1(2) and N.D. Admin. Code § 98–02–02–15. We are not persuaded good cause was shown to disqualify the hearing officer.

## IV

[¶ 29] Elter contends the plain language of N.D.C.C. § 65–10–03 requires the Bureau to pay her attorney fees. The version of the statute applicable to Elter provides in part:

The cost of the judicial appeal and an attorney's fee for the claimant's attorney must be borne by the bureau when the claimant prevails. The claimant is deemed to have prevailed when any part of the decision of the bureau is reversed or the claim is remanded to the bureau for further administrative proceedings.

N.D.C.C. § 65–10–03 (1993). Elter argues she is entitled to attorney fees in connection with the initial proceedings and first appeal to the district court because the district court vacated the Bureau's order and remanded for further proceedings. The district court denied Elter's motion for attorney fees because she had not yet prevailed on "the merits" of her claim. While we disagree with Elter's assertion she is entitled to all fees associated with the initial proceeding, we agree with her assertion she is entitled to fees associated with the first appeal.

[¶ 30] Elter seeks the attorney fees and costs associated with the initial formal hearing. That relief, however, is provided for in N.D.C.C. § 65–02–08(2), which states in part: "The bureau shall pay an attorney's fees when … [t]he employee has prevailed after an administrative hearing under chapter 28–32." There is no dispute Elter did not prevail on the merits of her claim after the administrative hearing; the Bureau initially dismissed the claim, the hearing officer twice affirmed that order, and we have held the Bureau's decision is supported by a preponderance of the evidence. Since she did not "prevail after an administrative hearing," she is not entitled to attorney fees in connection with the administrative hearing.

[¶ 31] We conclude, however, Elter is entitled to her attorney fees and costs associated with her initial appeal to the district court. Chapter 65–10, N.D.C.C., addresses appeals from decisions of the Bureau to the district court. Section 65–10–03, N.D.C.C., provides for attorney fees associated with an appeal to the district from an adverse Bureau decision in which any part of the Bureau's decision is reversed or the matter is remanded for further proceedings. Since Elter's initial appeal resulted in a remand for further proceedings, she is entitled "[t]he cost of the judicial appeal and an attorney's fee for [her] attorney" associated with that appeal. N.D.C.C. § 65–10–03. We, therefore, reverse the district court's order denying Elter's motion for

attorney fees, and remand to the district court for determination of the amount of those fees. Because Elter has prevailed on her appeal from the district court's judgment denying her attorney fees, we further order she be awarded attorney fees and costs associated with this appeal. *See* N.D. Admin. Code § 92–01–02–11.1(3)(f).

[¶ 32] VANDE WALLE, C.J., NEUMANN, KAPSNER, JJ., and LAWRENCE A. LECLERC, D.J., concur.

[¶ 33] LAWRENCE A. LECLERC, D.J., sitting in place of SANDSTROM, J., disqualified.

